IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| JALIL RAJAII FLOYD #572644 | § | |
| v. | § | CIVIL ACTION NO. 6:22cv294 |
| BOBBY LUMPKIN, ET AL. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Plaintiff Jalil Floyd, a prisoner currently confined in the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged deprivations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. The named defendants are TDCJ-CID Director Bobby Lumpkin, TDCJ Executive Director Bryan Collier, Powledge Unit Wardens Nicole Sandifer and Vernon Mitchell, Majors K. Harbin and Nina Tanner, Chief of State Classification Timothy Fitzpatrick, University of Texas Medical Branch Director Lannette Linthicum, and two security officers identified as Poppoola and Eke.

I. The Plaintiff's Complaint

Plaintiff states that he is medically disabled and 62 years old. On April 9, 2022, he was sitting in the dayroom in 8 Dorm at the Powledge Unit, watching television. Another inmate named Rodriguez, approximately 33 to 40 years old, came up behind Plaintiff and grabbed his head under the chin. Rodriguez then slashed Plaintiff's neck with a six-inch can top which he apparently obtained from the kitchen trash bin.

Plaintiff states that several prisoners tried to help him as he went to the front of the dorm to try to obtain medical care. However, Plaintiff says he stopped in the aisle of 49 bunk and 2 bunk because Rodriguez was blocking the way, holding his weapon. Other inmates told Officers Poppoola and Eke that Plaintiff had been injured by Rodriguez, who was blocking the door, and that Plaintiff needed immediate medical care. The officers appeared to have trouble understanding the severity of the situation; neither of them told Rodriguez to drop the weapon or attempted to use chemical agents to make him comply or to neutralize the threat, even after they saw Plaintiff's condition. Instead, Plaintiff complains that the officers stood at the desk station nonchalantly, exhibiting no practical assault training.

About four minutes later, Plaintiff states that Lt. Standhope arrived at the door of the dorm and immediately ascertained the situation after the prisoners explained how dire it was. Rodriguez was standing at the door, still holding the weapon, threatening the other prisoners and saying "they should be lucky it wasn't one of them." Lt. Standhope opened the door, secured the weapon, and handcuffed Rodriguez. He also took Plaintiff out of the door for the medical staff who were coming down the hall.

Plaintiff states that the nurse told him to take off the towel he had pressed to his neck and lie down on the ground. When he took off the towel, blood began pouring out, and she used her hand to compress the wound. She said this was a "911," and used ice in an attempt to stop the blood flow.

About 15 to 20 minutes later, Plaintiff states that the ambulance arrived and the paramedics began to stabilize him for transport to the helicopter transport station. He was flown to the Mother Frances Hospital trauma ward in Tyler, where he was sedated and a surgical procedure was done which lasted almost an hour and a half.

Later that day, Plaintiff states that the hospital released him and he was returned to the Powledge Unit. He had two infusions of blood and his arteries and jugular vein had to be repaired. He learned at some point that the weapon used was a piece of scrap metal, normally found at the

back of the kitchen open trash bin holding area, which is under the responsibility of Kitchen Major Tanner.

The next day, Plaintiff says that he filed a grievance about the incident. He claims that he was receiving "mixed information" from the unit administration, which led him to believe that there was a "cover-up" going on.

Plaintiff says that he was held in protective custody for about eight days. He was returned to general population around April 19, 2022, and was put on the bus for transportation to the University of Texas Medical Branch Hospital in Galveston. He saw out of the window of the bus that the kitchen open bin area was still in use, although some of the kitchen scrap was being kept in an outside fencing area, directly behind the main perimeter, where building prisoners have no access to the metal.

On April 24, 2022, Plaintiff states that he went to outside recreation to get some fresh air. He saw that the open outside trash bin was full and that he and other prisoners had access to the bin, where material could be found which could be used for assaults. Plaintiff notes that "subsequently, a phase of incremental changes have taken place to the trash disposal area since Mr. Floyd's filed grievances." Nonetheless, Plaintiff contends that had higher security measures been in place with more "prudent caution," before he was attacked, he may not have suffered life threatening injuries.

According to Plaintiff, the Powledge Unit is not set up to deal with violent prisoners. He indicates that the unit lacks adequate metal detectors or screening devices such are installed at maximum security units. While most maximum security units do have outside dorms, Plaintiff states that these other dorms have cameras for constant supervision and prisoners have to meet rigorous classification profiles, and violent prisoners are housed on cellblocks.

Plaintiff states that Rodriguez has been in prison for approximately three years on a 40+ year sentence for murder. He says that the prison administration knew or could have ascertained how dangerous he was from his psychological and criminal profile, but they failed to do so. Plaintiff

claims that an officer from the Office of the Inspector General told him that Rodriguez should never have been on the Powledge Unit with unsupervised dormitories.

Plaintiff states it is his belief that discovery will show that quite a number of violent prisoners were being held at the Powledge Unit through "de facto policy" at this time. He says that during February, March, and April, he saw that "large numbers of young prisoners were indiscriminately transported from one closed unit, and another downsized unit to and off Powledge Unit from maximum security due to staffing shortages." He also believes that discovery will reveal "more facts in support of the pleadings herein, and the names of all parties relevant to this action, also witness statements in conjunction with supporting evidence to establish a prima facie case."

Plaintiff states that he has suffered considerably from emotional post-traumatic stress disorder, saying that he has irregular sleeping patterns and wakes up from reliving the assault, over and over again. He has "unrealistic fears" of people behind him and he is apprehensive of people approaching and touching him.

In a section of his complaint entitled "Claims," Plaintiff argues that the Defendants owed him a duty of reasonable care and safety as a prisoner under their direct control assigned to a medical facility. He says that the failure to appropriately review the classification of inmates according to established policy and separate particularly violent or particularly vulnerable inmates was the moving force behind his injury, and the current policy is not adequate in form to protect disabled prisoners from violent prisoners with mental illnesses who are unable to control their behavior.

Plaintiff further contends that the defendants' over-reliance on minimum supervision medical dormitory housing for violent inmates due to the closing of prison units and unit wings because of staffing shortages was also a moving force of his injuries due to "de facto policies." He argues that the defendants' failure to control tools or other items which can be used as weapons, including the ineffective securing of scrap metal produced in the kitchen and the disposition of this metal in an accessible outside trash bin was a moving force behind the injury. He states that the claim of inaction by security guards who witnessed the results of the assault upon him are "undeveloped"

until further discovery, and that he seeks to bring a state tort claim as well. For relief, Plaintiff seeks $800,000 in damages, plus court costs and attorney's fees.

Plaintiff describes the incident in a Step One grievance attached to his complaint, and the response to this grievance stated that an Inmate Protection Investigation was conducted and Rodriguez was transferred to another unit. The response also indicated that allegations made by Rodriguez against Plaintiff were unsubstantiated.

In his Step Two grievance appeal, Plaintiff asserted that he has spoken to other inmates who are awaiting disciplinary hearings and drug use investigations. Many of these are gang members who are "amazed" that they came to be assigned to a unit like Powledge. Plaintiff claims that the unit is not set up to deal with violent prisoners because it is a minimum security unit with dormitories, yet violent prisoners are being housed with medically disabled inmates. He also asserts that there is not an adequate metal detection device and that Rodriguez would not have been in a dorm on a maximum security unit. The response to this grievance appeal says that an Inmate Protection Investigation was initiated on April 10, 2022, and Plaintiff was reviewed by the Unit Classification Committee on April 19. Sufficient evidence was found to substantiate Plaintiff's claims and Rodriguez was transferred off of the Powledge Unit to avoid further contact. The response noted that only one complaint would be investigated per grievance and a separate Step One grievance must be filed for additional complaints.

## II. Plaintiff's Motion for Review under Imminent Danger Exception

Plaintiff has filed a motion for leave to file an application for leave to proceed *in forma pauperis* to review his case under the imminent danger exception to 42 U.S.C. §1915(g). This statute provides that

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the ground that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Court records show that Plaintiff has previously filed three lawsuits or appeals which were dismissed as frivolous or for failure to state a claim upon which relief may be granted. *See Floyd v. Allen*, slip op. no. 17-20813 (5th Cir., March 9, 2018) (dismissing appeal for failure to pay the docketing fee because Plaintiff has three strikes). Consequently, he cannot proceed under the *in forma pauperis* statute unless he shows that he was in imminent danger of serious physical injury as of the date of the filing of the lawsuit. *Baños v. O'Guin*, 144 F.3d 883, 885 (5th Cir. 1998).

In his motion for leave, Plaintiff states that he was "violently assaulted as a risk group of elderly medically disabled prisoners." He says that prison closings and staff shortages resulted in a "de facto policy" to use a minimum security medical facility to house and mix violent transit prisoners in open unsupervised dormitories of general population and the unit does not have transit dorms to separate these prisoners. He also says that scrap metal from the unit kitchen is unreasonably stored in an open area, accessible to dangerous prisoners, because there is no fence to secure it and no cameras installed.

Next, Plaintiff claims that "inadequate or deficiently trained guest worker visa program staffing" is substandard for safety and security of risk group prisoners, indicating that staff members in this "guest worker visa program" lack proficiency in speaking and understanding English and also lack understanding of American customs and culture, as well as TDCJ policy.

Plaintiff asserts that if the evidence before the court shows that an inmate faces an objectively intolerable risk of serious injury, the defendants cannot plausibly persist in claiming lack of awareness. He acknowledges that Rodriguez was transferred, but says that he was locked up in protection investigation with other violent prisoners, who did not know how they came to be assigned to the Powledge Unit.

Plaintiff refers to the "large numbers of young prisoners" being transported to the Powledge Unit and says that the unit is still experiencing staffing shortages during the 10 pm to 6 am shift. He says that the One through Four Block dormitories may have one officer for a section of 212 inmates, when policy requires that there be three. Plaintiff states that he and other inmates are at risk

of assaults, alleging that previously, a 70 year old prisoner was assaulted by a younger prisoner who was "drunk on prison hooch." Plaintiff also references a recent prisoner escape from a transport bus and states that Dallas County is approaching capacity and has 400 TDCJ prisoners it needs to get rid of immediately. He contends that the prison administrators are engaged in a "de facto policy" to put prisoners anywhere they can through improper classification; Plaintiff asserts that many of these prisoners are young, dangerous, and violent, putting elderly disabled prisoners at risk.

Plaintiff contends that the "guest worker visa program" staff members (apparently referring to correctional officers Poppoola and Eke) exhibited no practical assault training and says that "one does not have to await the consummation of threatened injury to obtain preventative relief." While officers are not required to intervene physically, Plaintiff states that they must take some reasonable action upon witnessing an assault. The scrap metal access remains a problem because there is no direct supervision - no cameras, fencing, or metal detectors. He attaches copies of medical records showing his injuries.

### III. Discussion

Plaintiff seeks to invoke the imminent danger exception to §1915(g) in his motion for leave to file an application to proceed *in forma pauperis*. In order to meet this exception, the threat must be "real and proximate." *Ciarpaglini v. Saini*, 352 F.3d 328, 330 (7th Cir. 2003). Allegations of past harm do not suffice; the harm must be imminent or occurring at the time that the complaint or notice of appeal is filed, and the exception refers to "a genuine emergency" where "time is pressing." *Heimerman v. Litscher*, 337 F.3d 781, 782 (7th Cir. 2003). In passing the statute, Congress intended a safety valve to prevent impending harms, not those which had already occurred. *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 315 (3rd Cir. 2001). In that case, the Third Circuit rejected a claim that allegations of having been sprayed with pepper spray, combined with a claim that prison officials engaged in "continuing harassment, plots to hurt or kill him, and other forms of retaliation," sufficiently alleged imminent danger.

This Court and others have held that the prisoner must allege specific facts showing he is under imminent danger of serious physical injury at the time of the filing of the complaint; general allegations not grounded in specific facts indicating serious physical injury is imminent are not sufficient to invoke the exception to §1915(g). *Hyder v. Obama*, civil action no. 5:11cv26, 2011 U.S. Dist. LEXIS 31300, 2011 WL 1113496 (E.D.Tex., March 11, 2011, *Report adopted at* 2011 U.S. Dist. LEXIS 31288, 2011 WL 1100126 (E.D.Tex., March 24, 2011); *Valdez v. Bush*, slip op. no. 3:08cv1481, 2008 U.S. Dist. LEXIS 118452, 2008 WL 4710808 (S.D.Tex., October 24, 2008); *Ruston v. Dallas County*, slip op. no. 3:04cv1691, 2004 U.S. Dist. LEXIS 26391, 2004 WL 2512232 (N.D.Tex., Nov. 5, 2004).

Plaintiff argues that he is in "imminent danger" because of TDCJ's purported policies of transferring and holding violent inmates in the dorms at the Powledge Unit. This theory, if accepted, would effectively hold that Plaintiff is in "imminent danger" at all times and under all circumstances so long as he remains at the Powledge Unit, thus providing him with a blanket exception to §1915(g). Such a result is untenable. Like the Third Circuit, this Court declines to conclude that with one hand, Congress intended to enact a statutory rule that would reduce the volume of prisoner litigation, and with the other, it engendered an open-ended exception which would eviscerate the rule. *Abdul-Akbar*, 239 F.3d at 315; *see also Althouse v. Murray*, civil action no. 6:11cv608, 2011 U.S. Dist. LEXIS 153399, 2011 WL 7403058 (E.D. Tex., November 18, 2011, *Report adopted at* 2012 U.S. Dist. LEXIS 21230, 2012 WL 555411 (E.D. Tex., Feb.17, 2012, appeal dismissed) (blanket allegations about understaffing in the prison and overcrowding in the dayrooms, and similar claims, did not show imminent danger; such allegations would "create a situation in which § 1915(g) would have no effect because all prisoners could argue at all times that they are in imminent danger"); *Calton v. Wright*, civil action no. 6:12cv344, 2012 U.S. Dist. LEXIS 107329, 2012 WL 3135682 (E.D.Tex., June 29, 2012), *Report adopted at* 2012 U.S. Dist. LEXIS 107324, 2012 WL 3135675 (E.D.Tex., August 1, 2012, appeal dismissed) (rejecting theory that prisoner was in

"ongoing imminent danger" because prison officials knew his litigation history and retaliated against him).

Plaintiff's allegations about the assault reflect a past danger, not a present one, and thus do not fall within the "imminent danger" exception. The responses to his grievances indicate, and Plaintiff does not dispute, that his assailant was transferred to another unit and thus did not pose an imminent danger to Plaintiff at the time he filed his lawsuit. The bare possibility that some other inmate might attempt to assault Plaintiff at some unknown time in the future is not sufficient to show a "a genuine emergency where time is pressing." *See Abdul-Akbar*, 239 F.3d at 315. The burden is upon the plaintiff to show that he is in imminent danger, through specific facts rather than conclusory allegations. *Crane v. Hatton*, civil action no. 5:06cv6910, 2009 U.S. Dist. LEXIS 87601, 2009 WL 3112077 (N.D.Cal., September 23, 2009) (noting that "plaintiff has the burden of proving that he is in imminent danger of serious physical injury"); *Lyles v. Dretke*, civil action no. 6:08cv382, 2009 U.S. Dist. LEXIS 20849, 2009 WL 722076 (E.D.Tex., March 16, 2009) (general allegations not grounded in specific facts indicating that serious physical injury is imminent are not sufficient to invoke the exception to §1915(g)). The mere recitation of the phrase "imminent danger" does not invoke the exception to Section 1915(g). *Dixon v. Browne*, civil action no. 6:16cv1242, 2017 U.S. Dist. LEXIS 112730, 2017 WL 3084151 (E.D.Tex., July 19, 2017), *citing McClure v. Langley*, civil action no. 5:11cv208, 2012 U.S. Dist. LEXIS 72329, 2012 WL 1900012 (E.D. Tex., May 24, 2012); *Buckenberger v. Louisiana DPS & C*, civil action no. 15-732, 2016 U.S. Dist. LEXIS 20983, 2016 WL 707024 (M.D.La., February 22, 2016).

Because Plaintiff has not shown that he faced an imminent threat of serious physical injury at the time of the filing of the lawsuit, and he did not pay the full filing fee, this lawsuit should be dismissed pursuant to 28 U.S.C. §1915(g). However, he should be allowed a reasonable period of time in which to pay the filing fee and proceed with his lawsuit should he choose to do so.

## RECOMMENDATION

It is accordingly recommended that the Plaintiff's application for leave to proceed *in forma pauperis* be denied and the above-styled civil rights lawsuit be dismissed with prejudice as to the refiling of another *in forma pauperis* lawsuit raising the same claims as herein presented, but without prejudice to the refiling of this lawsuit without seeking *in forma pauperis* status and upon payment of the full $402.00 filing fee. It is further recommended that should the Plaintiff pay the full filing fee within 15 days after the date of entry of dismissal, he be allowed to proceed in this lawsuit as though the full fee had been paid from the outset.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

So ORDERED and SIGNED this 9th day of August, 2022.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE